POTOMAC ELECTRIC POWER COMPANY, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, and Terry M. Cross, Respondents.

No. 78–1073.

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 1979.

Decided Aug. 24, 1979.

Richard W. Turner, Washington, D. C., with whom Nicholas D. Ward, Washington, D. C., was on the brief, for petitioner.

William F. Krebs, Washington, D. C., with whom Leslie Scherr, Washington, D. C., was on the brief, for respondent Terry M. Cross.

Mark C. Walters, Atty., Dept. of Labor, Washington, D. C., for respondent Dept. of Labor. Cornelius S. Donoghue, Jr., Atty., Dept. of Labor, Washington, D. C., entered an appearance for respondent Department of Labor.

Before WRIGHT, Chief Judge, and SWYGERT * and MacKINNON, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Chief Judge:

On December 7, 1974 Terry M. Cross, Jr., a Class A cable splicer with the Potomac Electric Power Company (PEPCO), injured his left knee while on the job. The injury was sufficiently serious to require corrective surgery to remove the medial meniscus—fibrocartilage of the knee joint—from that knee. Because a Class A cable splicer performs many strenuous chores—including climbing ladders and scaffolding, crawling in and out of manholes, and lifting heavy equipment—the residual pain, discomfort, and unsteadiness experienced by Cross upon his return to work prevented him from discharging the duties of that position. PEPCO nonetheless continued to list Cross on the roster of Class A cable splicers and to pay him at the straight hourly rate for that classification. Cross found this arrangement unsatisfactory, however, because PEPCO refused to accord him the routine raises granted to others in his work classification and to allow him any of the overtime work that he had become accustomed to receiving over the years.

* Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

In February 1976 Cross filed a claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act.[1] Because he and PEPCO could not agree on a method for computing compensation, the matter proceeded to a formal hearing before an Administrative Law Judge (ALJ). After receiving medical testimony that characterized Cross's injury as a five to 20 percent disability of the leg, the ALJ concluded that "Claimant has become permanently partially disabled because of the accident [and] can no longer perform the rigorous work of a Cable Splicer A * * *."[2] Noting that Cross lost overtime work and pay raises due to the injury, the ALJ awarded him compensation under Section 8(c)(21) of the Act.[3] The award, as specified by that section, was based on the difference between Cross's pre-injury weekly wages and his post-injury wage-earning capacity.[4]

PEPCO appealed the ALJ's decision to the Department of Labor's Benefits Review Board and urged there that Sections 8(c)(1)–(20) of the Act,[5] providing scheduled allowances for specified injuries, ought to have been used as the basis for awarding compensation rather than Section 8(c)(21). The Board held, however, that the scheduled benefits contained in Sections 8(c)(1)–(20) are not exclusive remedies and that, if a claimant can prove a loss in wage-earning capacity greater than that provided for in the schedule, he may pursue a claim under Section 8(c)(21).[6] Because the ALJ had found that Cross had sustained a loss in earning capacity greater than the compensation provided by the schedule, the Board affirmed the initial decision.[7] PEPCO, contending that the Board's analysis was premised on a faulty reading of the Act, petitions this court to set aside the Board's decision.[8]

This court must determine whether the decision of the Benefits Review Board to affirm the judgment of the ALJ is consistent with applicable law.[9] Under the Act the Board was bound to regard the ALJ's findings of fact as conclusive if supported by substantial evidence in the record considered as a whole.[10] The Board decided that the ALJ's findings were so supported,[11] and we see no reason to disagree. Nor does PEPCO press before us the claim that the Board misapplied the substantial evidence standard. Rather, PEPCO argues that both the Board and the ALJ erred by compensating Cross under the wrong provision of the Act. Specifically, PEPCO contends, as it did before the ALJ and the Board, that a failure to regard the scheduled benefits in Sections 8(c)(1)–(20) as exclusive remedies is an error in law. If PEPCO is correct in this respect, of course, reversal is mandated.

1. 33 U.S.C. § 901 et seq. (1976). The Longshoremen's and Harbor Workers' Compensation Act is made applicable to the District of Columbia by 36 D.C. Code § 501 (1973).

2. Joint Appendix (JA) 5–6.

3. 33 U.S.C. § 908(c)(21).

4. The ALJ concluded that Cross's lost earning capacity owing to the injury equaled $130.13 per week. This figure was arrived at by determining the amount of the base pay increases that Cross was denied after the injury and the amount of overtime pay lost due to the injury. The latter amount was based on the ratio of overtime to base earnings for 1972, 1973, and 1974. JA 3–4. Under 33 U.S.C. § 908(c)(21) Cross was entitled to weekly compensation of 66⅔% of his lost earnings, which totaled $86.76 per week. The statute's compensatory scheme is described in text at notes 13–18 infra.

5. 33 U.S.C. §§ 908(c)(1)–(20). PEPCO specifically urged that compensation be based on 33 U.S.C. § 908(c)(2), which provides compensation for permanent partial disability based on lost use of a leg, and on 33 U.S.C. § 908(c)(19), which provides for proportional compensation for partial loss of use of a member.

6. JA 13–14.

7. Id.

8. 33 U.S.C. § 921(c).

9. See Atlantic & Gulf Stevedores, Inc. v. Director, Office of Wkrs' Comp. Programs, 542 F.2d 602, 608 (3d Cir. 1976); Presley v. Tinsley Maintenance Service, 529 F.2d 433, 436 (5th Cir. 1976).

10. 33 U.S.C. § 921(b)(3).

11. JA 12.

■ Analysis must commence with the general proposition that the act whose construction is at issue is remedial in nature and must be construed in light of its humanitarian objectives. In the words of the Supreme Court,

> The measure before us * * * requires employers to make payments for the relief of employees and their dependents who sustain loss as a result of personal injuries and deaths occurring in the course of their work whether with or without fault attributable to employers. Such laws operate to relieve persons suffering such misfortunes of a part of the burden and to distribute it to the industries and mediately to those served by them. They are deemed to be in the public interest and should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results. * * *[12]

Yet though a liberal construction of the Act is in order, we are mindful that no court has license to rewrite this or any other act of Congress.

The Act's compensatory scheme encompasses four classes of disability: permanent total,[13] temporary total,[14] permanent partial,[15] and temporary partial.[16] It is undisputed that Cross falls in the third category—permanent partial disability. The Act compensates disabilities of this type in one of two ways. First, in Sections 8(c)(1)–(20) the Act enumerates specific injuries—ranging from loss of an arm to disfigurement—for which the successful claimant is to receive compensation totaling two-thirds of his average weekly wages for a prescribed number of weeks. A lost arm, for example, occasions 312 weeks' compensation at that level.[17] The second method of compensation, contained in Section 8(c)(21), applies to "all other cases" and provides for compensation amounting to two-thirds of "the difference between [the claimant's] average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise * * *."[18]

PEPCO's contention that compensation based on Section 8(c)(21) is in error rests largely on its conception of the statutory scheme. Its argument, in brief, is that when Congress enumerated specific injuries in succession and then tacked on an additional provision applicable to "all other cases" it had in mind two mutually exclusive categories. This structural arrangement, according to PEPCO, makes clear that Sections 8(c)(1)–(20) represent the exclusive remedy for disabilities caused by the specified injuries. We believe, however, that there is another, more rational, way of reading the statute.

■ The statute defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment."[19] Yet under the permanent partial disability classification the scheduled injuries are by their very nature considered to be compensable regardless of their concrete impact on the employee's wage-earning capacity. As the Board wrote, "The schedule * * * contemplates an easily administered system of compensation, where a claimant need not prove a loss in wage-earning capacity. Rather, the loss in wage-earning capacity is presumed without reference to claimant's actual occupation."[20] But there is another form that

---

12. *Baltimore & Philadelphia Steamboat Co. v. Norton,* 284 U.S. 408, 414, 52 S.Ct. 187, 189, 76 L.Ed. 366 (1932). *Accord, Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953). *See* 2 A. Larson, The Law of Workmen's Compensation § 58.20 at 10–218 (1976).

13. 33 U.S.C. § 908(a).

14. 33 U.S.C. § 908(b).

15. 33 U.S.C. § 908(c).

16. 33 U.S.C. § 908(e).

17. 33 U.S.C. § 908(c)(1).

18. 33 U.S.C. § 908(c)(21).

19. 33 U.S.C. § 902(10).

20. JA 13 (*citing Travelers Ins. Co. v. Cardillo,* 225 F.2d 137 (2d Cir.) *cert. denied,* 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955)).

compensation for permanent partial disability may take—that contained in Section 8(c)(21). To establish an entitlement to compensation under this provision the claimant must prove that the injury has resulted in an actual diminution of earning capacity. Thus, although Cross's work-related injury is confined to his left knee—for which he is eligible for compensation under the scheduled benefits [21]—the injury also renders his entire body, as a functioning economic unit, permanently partially disabled. Because he is capable of establishing the actual diminution in earning capacity required for compensation under Section 8(c)(21), he is brought within that part of the compensatory scheme. Reading the statute in this way yields the conclusion that a claimant's showing of economic disability in excess of the scheduled loss is one of the "other cases" provided for in Section 8(c)(21).

■ The latter conception of the statutory scheme accords not only with the statute's remedial objectives,[22] but also with this court's decision in *American Mutual Ins. Co. of Boston v. Jones.*[23] In *Jones* we held that the compensation for a claimant who had lost use of a hand was not to be based on the scheduled injury provision,[24] but rather on the method for computing compensation under the permanent total disability section of the statute.[25] Pointing out that " 'disability' is an economic and not a medical concept," [26] we concluded that "[e]ven a relatively minor injury must lead to a finding of total disability if it prevents the employee from engaging in the only type of gainful employment for which he is qualified." [27] Although *Jones* did not deal with permanent partial disability, the reasoning it employed to free the deserving claimant from the fetters of the scheduled injury provisions applies equally here. Permanent partial disability, no less than total disability, is an economic concept whose meaning in any single case is tied inextricably to the claimant's wage-earning capabilities. Where the scheduled benefits fail adequately to compensate for a diminution in those capabilities, Section 8(c)(21) is the remedial alternative.[28]

Our refusal to confine the claimant in this case to the scheduled injury provisions accords as well with the recent trend in workmen's compensation law away from the idea of exclusivity of scheduled benefits. As Professor Larson has written,

Although it is difficult to speak in terms of a majority rule on this point, because of significant differences in statutory background, it can be said that at one time the doctrine of exclusiveness of schedule allowances did dominate the field. But in recent years there has developed such a strong trend in the opposite direction that one might now, with

---

21. 33 U.S.C. §§ 908(c)(2), (19).

22. *See* text at note 12 *supra.*

23. 138 U.S.App.D.C. 269, 426 F.2d 1263 (1970).

24. 33 U.S.C. § 908(c)(3).

25. 33 U.S.C. § 908(a).

26. 138 U.S.App.D.C. at 271, 426 F.2d at 1265 (*citing* 33 U.S.C. § 902(10)).

27. *Id.,* 138 U.S.App.D.C. at 272, 426 F.2d at 1266.

28. It may be argued that the scheduled benefits at times *over* compensate a particular claimant whose wage-earning capacity has not been diminished by a scheduled injury. An attorney who loses use of an arm, for example, is presumably as capable of performing his legal functions after as before his injury, but he would nonetheless be eligible for scheduled benefits. It follows, the argument continues, that this injury, too, would be subject to compensation based on § 8(c)(21), which is to say that the hypothetically injured attorney would go uncompensated.

The apparent symmetry achieved by this argument is only superficially pleasing, however, for §§ 8(c)(1)–(20) represent a conclusive congressional determination that certain injuries entitle a claimant to benefit on grounds that he is *injured,* not on grounds that he is actually *disabled.* (The latter term, it will be remembered, is an economically tied notion under the statute.) This congressional determination in effect constructs a compensatory floor that individual claimants, such as the present one, may exceed by resort to § 8(c)(21) if able to establish a sufficient level of disability owing to the injury.

equal justification, say that the field is dominated by the view that schedule allowances should not be deemed exclusive, whether the issue is treatment of a smaller member as a percentage loss of a larger, or treatment of any scheduled loss as a partial or total disability of the body as a whole.[29]

Although Professor Larson relies primarily on state cases to support his observation,[30] the reasoning in those cases applies with equal force at the federal level.[31]

PEPCO also contends that the exclusivity of the scheduled benefits is supported by precedent in the federal system. In particular, PEPCO relies on *Williams v. Donovan*,[32] a 1964 District Court judgment affirmed in a one-paragraph *per curiam* opinion by the Fifth Circuit. The claimant in *Williams* also suffered an injury to his knee. In authorizing compensation under the scheduled benefits, the District Court expressly endorsed the exclusivity of those benefits. The Fifth Circuit did not discuss the exclusivity issue in its brief opinion affirming.

In light of the clear trend in workmen's compensation law away from exclusivity, we simply find the District Court's conclusion in *Williams* unpersuasive.[33] Moreover, *Williams* was decided prior to this court's opinion in *Jones*, and we see nothing in the

District Court's opinion to deflect the force of the reasoning in *Jones*. Drawing upon that reasoning, and upon the remedial thrust of the statute at large, we hold that a showing of economic disability in excess of the scheduled loss is one of the "other cases" provided for in Section 8(c)(21).

Accordingly, the decision of the Benefits Review Board is

*Affirmed.*

MacKINNON, Circuit Judge, dissenting:

Section 8 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 908 (1976), contains a schedule of benefits in which Congress has conclusively presumed the compensation due an employee who sustains an enumerated injury in the course of his employment. Nothing in section 8 permits an employee whose injury is unquestionably confined to one of those set out in the schedule to circumvent Congress' conclusive presumptions with a showing of lost earning capacity in excess of the specified benefit. The majority holds otherwise, and does so despite the fact that during the fifty-two year old regime of an essentially unaltered statutory scheme no federal court has ever read section 8 in that manner while a number of federal courts have adopted a contrary approach. I am

29. 2 A. Larson, *supra* note 12, § 58.20 at 10–212 to 10–214 (footnotes omitted).

30. *See id.* § 58.20 at 10–213 n.27 (citing cases); *id.* (Feb. 1979 Supp.) (citing cases).

31. For an example of a state court's reasoning, *see, e. g., Van Dorpel v. Haven-Busch Co.*, 350 Mich. 135, 85 N.W.2d 97, 102 (1957):

[The purpose of the schedule is] to consult broad industrial experience and lay down an irreducible minimum number of weeks allowable for certain common specific losses—thus removing the issue from costly and delaying litigation at a time when the workman was most helpless and his need the greatest—leaving the question of further disability and compensation to be determined on proofs made at a hearing * *, having due regard for the nature and extent of the injuries, the then capacities and general condition of the workman, and the kind of job he had before his injury[.] * *

As a further indication of the clear trend away from exclusivity, the New Mexico case of *Casados v. Montgomery Ward & Co.*, 78 N.M. 392, 432 P.2d 103 (1967), on which PEPCO relies as support for exclusivity, has recently been overruled by *American Tank & Steel Corp. v. Thompson*, 90 N.M. 513, 565 P.2d 1030 (1977), which held that a schedule is not an exclusive remedy.

32. 234 F.Supp. 135 (E.D.La.1964), *aff'd*, 367 F.2d 825 (5th Cir. 1966) (*per curiam*), *cert. denied*, 386 U.S. 977, 87 S.Ct. 1174, 18 L.Ed.2d 139 (1967).

33. The Benefits Review Board, which in 1972 replaced the District Courts as initial review tribunals under the Act, *see* 33 U.S.C. § 921(b), (c), has also found the reasoning in *Williams* unpersuasive in cases in addition to the one before us today. *See, e. g., Dugger v. Jacksonville Shipyards*, 8 B.R.B.S. 552 (1978); *Brandt v. Avondale Shipyards, Inc.*, 8 B.R.B.S. 698 (1978).

not unsympathetic to the result the majority's holding achieves, but I submit that it is within the province of the legislative branch to weigh and decide whether this result ought to obtain. Accordingly, I dissent.

## I

The material facts in this case are not in dispute. Respondent Cross worked for the Potomac Electric Power Company (PEPCO) as a Class A cable splicer, a position in which he was able to obtain some overtime work. The concededly rigorous work of a Class A cable splicer requires one to possess the physical agility to climb ladders and scaffolds, lift heavy equipment, get in and out of manholes, and the like. In December 1974, while working in a manhole, Cross twisted his left knee and tore a cartilage which had to be surgically removed. The doctor who performed the operation later testified that the operation had been a success but that Cross had sustained a 5% partial disability of his left leg. Another physician rated Cross' disability somewhat higher—approximately 20% disability of his left leg.

When Cross returned to work he was placed on the light duty roster. While he remained listed as a Class A cable splicer and received the normal base wage PEPCO pays employees in that position, Cross no longer performed the rugged tasks in which other cable splicers engaged. He worked no overtime. Apparently in consequence of his light-duty status, PEPCO denied Cross in-grade raises awarded to other Class A cable splicers in 1975.

PEPCO and Cross were unable to agree on a method for compensating the latter's disability and so the matter was referred to an administrative law judge. Following a hearing on the claim, the administrative law judge filed findings of fact in which he recounted the testimony of the two physicians whose joint estimate rated Cross' disability as a 5% to 20% loss of use of his left leg. There was no other testimony relating to injuries Cross sustained. There was no finding that Cross' injury extended to a part of his body other than the left leg.

PEPCO contended that on this evidence the statute compelled an award under section 8(c)(2), (19), which establishes the benefits due for the partial loss of use of a leg. The administrative law judge disagreed, holding that because Cross had shown a loss of wage earning capacity (through loss of overtime and denied wages) in excess of the scheduled benefit, he was entitled to elect compensation under section 8(c)(21), which contains a formula for "other cases." Using this formula, the administrative law judge awarded Cross two-thirds of the amount of lost overtime based on Cross' earnings during the period 1972–1974.

On PEPCO's appeal, the Benefits Review Board upheld the administrative law judge's findings of fact and conclusions of law. Citing no authority other than two recent decisions of its own, the Board reasoned that "if a claimant can prove a loss in wage-earning capacity greater than that provided in the schedule, he may pursue a claim under Section 8(c)(21)." It is this conception of section 8(c)(21) that PEPCO challenges here.

## II

I fully agree with the majority that our chore here is to interpret a statute, not second guess resolutions of disputed fact. I concur in its view that if the Board erred in compensating Cross under section 8(c)(21), this court must reverse the Board's decision. I believe that if the majority indeed interpreted section 8(c)(21) in accordance with the ordinary rules of statutory construction, it would join in concluding that the Board erred in compensating Cross thereunder and hence that reversal of the Board's decision is required.

The touchstone of statutory construction is the language of the statute. The inquiry begins not with conjecture about what Congress would have liked to have said when it wrote the statute or with what Congress would say today given the chance, but rather with what Congress indeed expressed in the statutory text. See 2A C. Sands, *Sutherland Statutory Construction* § 45.07 (4th

ed. 1973). The plain and ordinary meaning of the words Congress used guides this inquiry. *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961); *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370, 45 S.Ct. 274, 69 L.Ed. 660 (1925). "Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meaning need no discussion." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1916); *accord, Jay v. Boyd*, 351 U.S. 345, 357, 76 S.Ct. 919, 100 L.Ed. 1242 (1956); *Packard Motor Co. v. National Labor Relations Board*, 330 U.S. 485, 492, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). Although the identification of the ordinary meaning of a statutory term is itself an exercise in interpretation, *see* 2A C. Sands, *supra*, § 45.02, the *Caminetti* principle counsels courts to avoid exploratory frolics into subjective policy considerations when the common and natural meaning of the words in a statute directs the court to a particular and unavoidable result.

### III

There is no difficulty in identifying the meaning of the words Congress used in section 8(c) to describe the benefits due a permanently partially disabled employee who sustains a partial loss of use of one leg. The statute provides:

Compensation for disability shall be paid as follows:

. . . . .

(c) Permanent partial disability: In case of disability partial in character but permanent in quality the compensation shall be 66⅔ per centum of the average weekly wages, which shall be in addition to compensation for temporary total disability paid in accordance with subdivision (b) or subdivision (e) of this section, respectively, and shall be paid to the employee, as follows:

. . . . .

(2) Leg lost, two hundred and eighty-eight weeks' compensation.

. . . . .

(19) Partial loss or partial loss of use: Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of a member.

33 U.S.C. § 908 (1976).

The clear import of this language is that when a claimant sustains a permanent partial disability owing to the partial loss of use of a leg he is to receive two-thirds of his average weekly wage for a period corresponding to the proportion of 288 weeks which his injury bears to the loss of a leg. In this case, Cross is permanently partially disabled owing to a 5–20% loss of use of a leg. That was the finding of the administrative law judge and there is no finding of injury beyond that. We cannot second guess his factual resolutions. Cross is thus entitled to two-thirds of his average weekly wage for a period comprising some portion of 288 weeks.

The majority's contrary result springs from section 8(c)(21), the second to last paragraph of the Longshoremen's Act's schedule of benefits. It provides:

Other cases: In all other cases in this class of disability the compensation shall be 66⅔ per centum of the difference between his average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the deputy commissioner on his own motion or upon application of any party in interest.

33 U.S.C. § 908(c)(21) (1976) (emphasis added).

This "other cases" clause certainly contains a compensatory scheme different from that applicable to the specified injuries immediately preceding it in the statute. Whereas permanently partially disabled claimants falling under the specific schedule receive two-thirds of their average weekly wages for a pre-determined period of time, permanently partially disabled claimants falling into the "other cases" pro-

vision receive two-thirds of the difference between their pre- and post-injury earning capacity for an indefinite period. But the existence of two avenues of compensation does not necessarily mean that claimants have a choice between the two. It is the availability of the choice, not the existence of two schemes, that is the issue in this case. I submit that the language of the statute is barren of any indication that the choice the majority presumes indeed exists.

The key is the underscored word "other." To my mind this word manifests that Congress intended to fashion two different schemes for two different species of permanently partially disabled claimants. The dictionary defines "other" as describing something "[d]ifferent or distinct from that already mentioned." *Black's Law Dictionary* 1253 (4th ed. 1968); see *Missouri Pacific Railroad Co. v. Campbell,* 502 S.W.2d 354, 358 (Mo.1973); *Webster's New International Dictionary* 1729 (2d ed. 1959). The "all other cases" to which section 8(c)(21) applies refers to cases "different or distinct" from cases already mentioned, namely, the cases set out in the schedule. If the injury is one described in the schedule, then the benefits mandated therein control; if the injury is different or distinct from one set out in the schedule, then the "other cases" provision controls.

The "other cases" provision has an important but limited role to play in workmen's compensation. The schedule of benefits contained in section 8(c) does not exhaust the range of conceivable work-related injuries. Reflecting the primary concerns of the industrial age in which it was adopted, the enumerated injuries schedule focuses on anatomical losses such as arms, legs, hands, fingers, toes, and the like. The schedule makes no specific provision for injuries such as a heart attack, a hernia, a back impairment, a cancer, or a mental disorder. Rather than attempt to anticipate and itemize every imaginable work-related misfortune that innumerable employment conditions might engender, Congress needed a catch-all provision to encompass claims based on injuries not identified in the schedule. Hence the "other cases" provision. Insofar as the provision concerns us on the facts of this case, the words "other cases" really mean "heart attack cases," "hernia cases," and other non-scheduled injuries.

I would hold that only a finding of an injury different from or more extensive than one of those specified in the schedule triggers the "other cases" provision. There being no such finding here, I would vacate the Board's order.

### IV

The legislative history of the Longshoremen's Act contains no clear answer to the question at bar, but I think it is fair to infer from that history that Congress did not intend the construction the majority endorses. Congress enacted the Longshoremen's Act in 1927. Act of March 4, 1927, Pub. L.No. 803, chap. 509, 44 Stat. 1427. The proposal that ultimately became law was introduced in the Senate the year before as S.3170. As recommended by the Senate Committee and adopted by the Senate, S.3170 had no schedule of benefits. *See* 67 Cong.Rec. 10614 (1926). The bill instead provided that the compensation provisions of the Federal Employees Compensation Act would control. S.Rep.No. 973, 69th Cong., 1st Sess. 2–3 (1926); 67 Cong.Rec. 10614 (1926) (remarks of Sen. Walsh). At that time, the Federal Employees Compensation Act provided for compensation on the basis of two-thirds of the difference between the claimant's pre- and post-injury earning capacity. *See* 5 U.S.C. §§ 754, 756 (1926 ed.) (enacted as Act of September 7, 1916, Pub.L.No. 267, chap. 458, § 4, 39 Stat. 743).

The House Committee did not accept the earning capacity provision and amended S.3170 to include a schedule of benefits. H.R.Rep.No. 1767, 69th Cong., 2d Sess. 4 (1927); 68 Cong.Rec. 5404 (1927). The Report accompanying this change explained that the Committee had reshaped the Senate bill along the lines of a House proposal that the Committee had recommended for passage the year before. H.R.Rep.No. 1767, *supra,* at 20. The House Committee Report

on that earlier proposal revealed that the provisions of the bill had been borrowed from the New York workmen's compensation statute. H.R.Rep.No. 1190, 68th Cong., 2d Sess. 2 (1926); *see Travelers Insurance Co. v. Cardillo*, 225 F.2d 137, 143 (2d Cir.), *cert. denied*, 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955); 68 Cong.Rec. 5412 (1927) (remarks of Rep. O'Connor). The New York statute, like the House Committee version of S.3170, contained a schedule of benefits and an "other cases" clause. *Compare* N.Y. Workmen's Compensation Law § 15(3), ¶ v (1927) *with* H.R.Rep.No. 1767, *supra*, at 4. The House adopted the House Committee version, 68 Cong.Rec. 5414 (1927), and the Senate concurred in the bill as amended, *id.* at 5909.

Three features of the foregoing are noteworthy. First, Congress rejected a compensatory scheme for all injuries solely based on lost earning capacity. It opted instead to specify particular injuries and thereby to create a conclusive presumption on the benefits due a claimant who sustains a scheduled injury. This reflects a desire to avoid a case-by-case determination in situations involving what were then the most common industrial injuries. Second, this effort to avoid case-by-case contention of benefits is consistent with the statute's overall goal of putting an end to the costly and time-consuming actions for damages at common law. This concern and the parallel concern of administrative orderliness that is crucial to understanding the concept of scheduled benefits permeate the sparse record of legislative deliberations. *See, e. g.,* H.R. Rep.No. 1767, *supra,* at 19–20; 68 Cong.Rec. 5410 (1927) (remarks of Rep. Graham). Third, the federal statute, and in particular the schedule of benefits, was lifted from the New York statute. Although New York's understanding of what its statute means is not binding on us, it is certainly probative of what Congress believed it was adopting when it imported New York's schedule into the federal scheme. In a decision issued not long after Congress adopted the New York schedule in the Longshoremen's Act, the New York Court of Appeals found self-evident the answer to the question this court confronts today:

Obviously, the phrase "in all other cases" signifies that the provisions of the paragraph shall apply only in cases where the injuries received are not confined to a specific member or specific members.

*Sokolowski v. Bank of America*, 261 N.Y. 57, 62, 184 N.E. 492, 494 (1933).

The construction of the "other cases" provision in section 8(c)(21) that the majority reaches contradicts each of these features of the legislative history of the Longshoremen's Act. Ignoring Congress' rejection of a provision which would have permitted Cross compensation solely based on proof of lost earning capacity, the majority fashions precisely such a provision out of the "other cases" clause. Neglecting to note that the purpose underlying the compensation laws was to put an end to administratively burdensome and litigious confrontations on the amount of compensation due an employee for a specified injury, the majority supports an interpretation of the "other cases" provision which opens the door to case-by-case determinations of benefits Congress conclusively presumed in the schedule. And, finally, the majority's interpretation flouts the "obvious" meaning given the "other cases" clause contained in the statute on which the Longshoremen's provision was based.

Congress has amended the Longshoremen's Act a number of times since 1927. *See, e. g.,* Act of October 27, 1972, Pub. L.No. 92–576, 86 Stat. 1252; Act of July 26, 1956, Pub.L.No. 84–803, 70 Stat. 655; Act of June 24, 1948, chap. 623, 62 Stat. 602; Act of June 25, 1938, chap. 685, 52 Stat. 1164; Act of May 26, 1934, chap. 354, 48 Stat. 806. *The "other cases" provision, however, remains unchanged since its original enactment in 1927.* Congress has referred to the provision on at least two occasions in amending other provisions of the statute, and these two comments support an interpretation based on the plain meaning of the words in section 8(c)(21).

In 1938, Congress amended the statute to include the current section 8(h), which spe-

cifically relates to the computation of wage earning capacity under section 8(c)(21). Act of June 25, 1938, chap. 685, § 5, 52 Stat. 1165 (codified at 33 U.S.C. § 908(h) (1976)). Both the House and the Senate Reports on the proposed legislation expressed alarm at the "wasteful litigation" which "other cases" claims under section 8(c)(21) frequently occasioned, and both used the example of an "industrial hernia," a non-schedule injury, to describe the kind of cases falling into that category. *See* S.Rep.No. 1988, 75th Cong., 3d Sess. 5 (1938); H.R.Rep.No. 1945, 75th Cong., 3d Sess. 5 (1938). There is no indication in these reports that Congress intended the "other cases" provision to extend to claims based on injuries specified in the schedule.

In the most recent amendment of the statute in 1972, Congress clarified the "second injury" provisions, adopting different benefits for scheduled and nonscheduled injuries. In referring to the benefits available in situations compensable under section 8(c)(21), the House Report explained that "[i]n the case of injuries *not described in section 8(c)(1)–(20)*" certain benefits would obtain. H.R.Rep.No. 92–1441, 92d Cong., 2d Sess. 18 (1972), U.S.Code Cong. & Admin. News 1972, pp. 4698, 4715 (emphasis added). This indicates Congress' understanding that the "other cases" provision included only injuries "not described in" the schedule.

### V

Congress is no stranger to the problem we confront here of a permanently partially disabled claimant whose lost earning capacity from a scheduled injury is not fully redressed by the scheduled benefit, for Congress amended the Federal Employees' Compensation Act to accommodate precisely this concern.

As noted above, when originally enacted the Federal Employees' Compensation Act did not contain a schedule of benefits; it compensated claims based on all injuries with the same formula section 8 of the Longshoremen's Act confines to "other cases." In 1949 Congress amended the statute to provide for scheduled benefits for permanent partial disability. Act of October 14, 1949, chap. 691, § 104, 63 Stat. 855. The Committee reports accompanying the measure in each chamber stated that this change was intended to bring the statute in line with the prevailing practice in most American jurisdictions. S.Rep.No. 836, 81st Cong., 1st Sess. 17 (1949); H.R.Rep.No. 729, 81st Cong., 1st Sess. 7 (1949), U.S.Code Cong.Serv.1949, p. 2125; *see* 95 Cong.Rec. 8756 (1949) (remarks of Rep. Keating). One Senate sponsor of the bill noted that the schedule was to conform to the one contained in the Longshoremen's Act. 95 Cong.Rec. 13607 (1949) (remarks of Sen. Douglas).

There was one important addition in the 1949 amendments which distinguishes the Federal Employees' Compensation Act from the Longshoremen's Act. The House Committee Report on the 1949 amendments explained:

> The [House] bill adopts . . . the most frequently used . . . approach [to workmen's compensation for permanent partial disability] which consists of a schedule for such particularized permanent disability and for facial disfigurement, *but with one important modification.* If the injury results in permanent major impairment, such as total loss or loss of use of an arm, hand, leg, foot, or eye, or total loss of hearing in both ears, a scheduled indemnity would, in most cases, be seriously inadequate. To overcome this inadequacy, *an employee suffering such serious injury to a member or function would, upon expiration of the compensation period specified in the special schedule, be protected against continued disability and impairment of his wage-earning capacity at the regular compensation rate applicable to such continued disability like other disabled employees. In these major injury cases, the schedule of compensation would thus be minimal rather than exhaustive;* . . .

H.R.Rep.No. 729, *supra,* at 7 (emphasis added); *see* 95 Cong.Rec. 8755 (1949) (remarks of Rep. McConnell). The Senate version was to the same effect. *See* S.Rep.No. 836, *supra,* at 17–18.

The Federal Employees' Compensation Act as amended in 1949 did not contain an "other cases" provision identical to the one in the Longshoremen's Act, but it did have a provision which operated the same way to cover cases not falling in the schedule. Despite this, Congress plainly assumed that the recovery for claims based on injuries contained in the schedule would be confined to the benefits therein described. Congress recognized that these benefits would not always compensate for lost earning capacity, and further recognized that some *legislative* action was required if claimants suffering *scheduled injuries* were to be eligible for benefits beyond that set out in the schedule. It therefore incorporated "one important modification" in the amendments which represented a departure from the "most frequently used" approach to compensating permanent partial disabilities arising from scheduled injuries. Even with this modification, a claimant must first go to the schedule that conclusively presumes the amount of recovery due him, and only after he receives the scheduled amount can he seek additional compensation.

In 1966 Congress again amended the Federal Employees' Compensation Act to extend the modification to encompass claims based on scheduled injuries other than those involving the total loss of a member. Act of September 6, 1966, Pub.L.No. 89–554, 80 Stat. 536. Under this amendment, claimants covered by the statute who, like Cross, suffer the partial loss of use of a member are entitled to the minimum compensation contained in the schedule and can thereafter recover benefits for continuing lost earning capacity. The history of this amendment exhibits Congress' understanding that absent legislative action the scheduled benefit represented the outward limit on the compensation due an employee whose claim derives from an injury set out in the schedule. For example, the Senate Report observed:

> Under existing law, certain persons suffering from specified permanent injuries (mostly the loss, or loss of use, of a member) are entitled to receive compensation for a specified number of weeks.

If the employee has suffered a permanent partial loss, or partial loss of use, of the member listed in the schedule, but no other significant impairment of the body, *he receives no further compensation after his scheduled award is exhausted.* On the other hand, if he has received a partial loss or partial loss of use, of a listed member and has also suffered a significant impairment in a part of the body not listed in the schedule, he can be compensated for loss of wage-earning capacity, if any, but not for the scheduled loss. The committee's amendment treats the person with a scheduled partial loss, whether or not accompanied by another disability, as the act now treats persons suffering total loss or loss of use of a member—*by allowing them the scheduled injury in each case, and by providing for compensation based on loss of wage-earning capacity after the scheduled award has been paid out.*

S.Rep.No. 1285, 89th Cong., 2d Sess. 3 (1966) (emphasis added); *see* H.R.Rep.No. 1304, 89th Cong., 2d Sess. 3 (1966) U.S.Code Cong. & Admin.News 1966, pp. 2430, 2431 (to the same effect).

In the most recent amendment of the Federal Employees' Compensation Act Congress adopted a formula the effect of which was to extend the benefits of a scheduled award to claimants who would otherwise be compensated under that statute's version of the "other cases" provision. Act of September 7, 1974, Pub.L.No. 93–416, § 4, 88 Stat. 1144. Congress once again indicated its understanding that claimants with injuries specified in the schedule would be confined to compensation described therein absent some explicit provision permitting compensation in addition to the scheduled benefit. *See* H.R.Rep.No. 1025, 93d Cong., 2d Sess. 4 (1974). This is particularly clear in one reference made in the Senate Report. The 1974 amendments permitted the Secretary of Labor to include non-scheduled injuries other than those Congress identified under the new schedule formula. The Senate Committee expressed its understanding that these other injuries would "not include

any organs already included within the Act's existing schedule of compensation." S.Rep.No. 1081, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, pp. 5341, 5345.

Hence when Congress intended a type of benefit for permanent partial disability set out in a schedule to be only a part of or alternative to other remedies, it has been able to express that intent. The same Senate and House Committees that have jurisdiction over the Federal Employees' Compensation Act have jurisdiction over the Longshoremen's Act. *Compare* S.Rep.No. 1081, *supra*, (Federal Employees' Compensation Act) *and* H.R.Rep.No. 1025, *supra,* (same) *with* 118 Cong.Rec. 30397 (1972) (Longshoremen's Act) *and* H.R.Rep.No. 1441, *supra,* (same). *See generally Senate Manual,* 95th Cong., 1st Sess. 36–37 (1977); Brown, *Rules of the House of Representatives* 333–34 (1979). A claimant under the Federal Employees' Compensation Act can do what Cross effectively seeks to do under the Longshoremen's Act, namely, obtain the benefit of the scheduled payment supplemented by two-thirds of the difference in his lost earning capacity. The difficulty for Cross is that he works for PEPCO, not the federal government, and the Longshoremen's Act, as opposed to the Federal Employees' Compensation Act, does not permit him to receive the compensation he seeks. When Congress intends a different result, it will modify the statute.

## VI

As noted, Congress enacted the "other cases" provision fifty-two years ago and has not changed it since. In the over half-century since 1927, no federal court has ever construed section 8(c) to provide two alternative compensation schemes for permanent partial disability claims based on injuries unquestionably confined as a matter of fact to members contained in the schedule. Conversely, every federal court that has considered this issue has either expressly or impliedly held that a claimant's wage-earning capacity is irrelevant when his claim is based on an injury specified in the schedule.

This is especially apparent in cases dealing with whether a *lack* of loss of wage-earning capacity deprives the claimant of the scheduled benefit. *See, e. g., Bethlehem Steel Co. v. Cardillo,* 229 F.2d 735 (2d Cir. 1955), *cert. denied,* 351 U.S. 950, 76 S.Ct. 847, 100 L.Ed. 1474 (1956); *Travelers Insurance Co. v. Cardillo, supra,* at 144; *Gulf Stevedore Corp. v. Hollis,* 298 F.Supp. 426 (S.D.Tex. 1969), *aff'd per curiam,* 427 F.2d 160 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970); *Cox v. American Store Equipment Corp.,* 283 F.Supp. 390 (D.Md.1968). Because the majority holds that wage-earning capacity can be relevant to a claim based on a scheduled injury, and because nothing in its analysis of the statute logically confines the relevance of wage-earning capacity to situations in which the claimant has actually suffered a loss, the majority effectively overrules the reasoning of this unbroken string of cases.

Two federal cases bearing on the issue here are illustrative. One is *Williams v. Donovan,* 234 F.Supp. 135 (D.La.1964), *aff'd per curiam* 367 F.2d 825 (5th Cir. 1966), *cert. denied,* 386 U.S. 977, 87 S.Ct. 1174, 18 L.Ed.2d 139 (1967). In that case, the employee injured his knee during the course of his employment. The testimony indicated that he had sustained a permanent partial loss of use of his leg. Compensation was awarded on the basis of the scheduled benefit. The employer argued that this method of compensation was in error because he was entitled to elect recovery under the "other cases" provision. The court categorically rejected the argument, reasoning on the basis of the statute that "it is evident that when considering compensation in a case of permanent partial disability, the form and language of the Act dictate that the wage-earning capacity test be applied *only in those 'other cases' not listed in the schedule." Id.* at 139 (emphasis added).

*Williams* is on all fours with this case. The majority rejects its reasoning without discussing it, partly on the basis of the brevity with which the Fifth Circuit affirmed it and partly on the basis of an ostensible trend in some other workmen's

compensation laws. This trend is discussed below, but concerning the majority's attempt to minimize the case on the basis of the length of the Fifth Circuit's affirmance, it is noteworthy that the use of a brief per curiam to affirm a district court opinion ordinarily indicates that the appellate court is completely in accord with the reasoning of the trial court. Moreover, speculation about the Fifth Circuit's position is unnecessary, for that court had the opportunity to reassess *Williams* as recently as several months ago, and expressly declined to do so. In *Jacksonville Shipyards, Inc. v. Dugger,* 587 F.2d 197 (5th Cir. 1979) (per curiam), the employer argued that because the claimants' injury fell within section 8(c)'s schedule, his compensation was confined to the benefit specified therein. As indicated, this has been the universal rule where compensation for permanent *partial* disability has been in issue. The Fifth Circuit rejected the argument because the claimant had demonstrated his disability was permanent and *total,* a situation which rendered the schedule irrelevant. *Williams,* the court of appeals said, was "consistent with our holding here" because in that case "the claimant was suffering from a partial disability, resulting from an injury to a specific member." *Id.* at 198. Thus a claimant can always show that his disability is total rather than partial, but if that latter is the case, then his compensation is determined by the schedule if his injury is confined to one of those specified therein.

Another case of note is *Flamm v. Hughes,* 329 F.2d 378 (2d Cir. 1964), in which the plaintiff claimed that section 8 erects "unconstitutional distinctions among various types of injuries in that it provides a specific schedule of compensation for a limited number of weeks for those injuries resulting in permanent partial disability which are explicitly enumerated in that provision but fails to provide for compensation in accordance with such schedules for permanent partial disability resulting from a combination of injuries not explicitly enumerated." *Id.* at 380. The precise issue for the Second Circuit was whether the district court erred in declining to convene a three-judge court to consider the question. The court of appeals affirmed on the ground that the plaintiff had failed to raise a substantial federal question. The claim was without merit because Congress "enjoys great latitude in promulgating a statutory scheme for the compensation of workers" and it did not act irrationally in deciding "to provide a specific schedule of compensation limited to a prescribed number of weeks for enumerated permanent partial disabilities and yet provide compensation for an indefinite period of time for all other injuries leading to permanent partial disability." *Id.* The unarticulated predicate for Judge Lumbard's opinion for the Second Circuit was that the two schemes were mutually exclusive as between each other; otherwise the issue would never have been raised. And the predicate was unarticulated because the language of the statute made the proposition so clear.

## VII

Lacking support in the statute, the legislative history, or the case law for its unique interpretation of section 8(c), the majority opts to rely on three general principles often invoked in workmen's compensation cases. In my view this reliance is misplaced.

### A

First the majority cautions that the Longshoremen's Act, being a remedial statute, must be construed in light of its humanitarian purposes. It later concludes that its construction of section 8(c) is in accordance with this tenet of statutory construction.

I do not disagree with the general proposition that a remedial statute must be construed with its remedial purposes in mind, though the proposition is itself little more than a restatement of the principle that congressional intent guides the construction

of a statute. If Congress intended the statute to provide a remedy, then courts must read the statute to achieve that congressional intent. The principle usually comes into play when the applicability of the statute is in question, that is, when the court must determine whether the statute covers a particular individual or circumstance. *See* 3 C. Sands, *supra,* § 72.05.

In this case we are unconcerned with whether Cross is covered by the statute; everyone agrees that he is. The question is how shall he be compensated. That a court must construe a statute with its remedial purposes in mind does not give a court, as the majority acknowledges, a "license to rewrite this or any other act of Congress." Maj. Op. at —— of 196 U.S.App.D.C., at 1327 of 606 F.2d. Nor does it mean that the language in the statute is to be construed beyond all reason to ensure the claimant the largest conceivable award the statute offers. Rather courts are confined to what the statute can fairly be read to mean. If there is an element of ambiguity, then perhaps the majority's general proposition can sway a court in the direction of the broader meaning. But using every intrinsic and extrinsic aid to statute construction at a judge's command, I can find no ambiguity. Only by ignoring the language and history of the statute can the court achieve the result it does. This undermines the foundation of the proposition on which the majority relies—that congressional intent governs construction of a statute.

## B

Next the majority stresses that "disability" is an "economic concept" rather than a medical one. To the majority this means that wage-earning capacity rather than physical injury governs compensation for disability. Fearful that this analysis might lead to a two-way street through section 8(c)(21) whereby a scheduled injury might go uncompensated if the employer can show no loss of wage-earning capacity, the majority contends that section 8(c)(1)–(20), the

schedule, represents "a conclusive congressional determination that certain injuries entitle a claimant to benefit on grounds that he is *injured,* not on grounds that he is actually *disabled."* Maj. Op. at —— n.28 of 196 U.S.App.D.C., at 1328 n.28 of 606 F.2d (emphasis in original). Thus for the majority disability is exclusively an economic concept while at the same time compensation for permanent partial disability based on scheduled injuries is exclusively a medical concept. This is confusion compounded.

Earlier I stated that nothing in the majority's analysis logically confines the relevance of wage-earning capacity to situations in which the claimant who has sustained a scheduled injury actually suffers a loss in earning capacity, *i. e.,* that the majority is creating precisely the two-way street through section 8(c)(21) which it purports to disclaim. This assertion is borne out by examination of the majority's treatment of disability as an "economic concept," for that treatment displays a very basic misunderstanding of the concept of disability and its relationship to the schedule of benefits in the Longshoremen's Act.

Disability is neither exclusively economic nor exclusively medical in character; it draws from both. *See* 2 A. Larson, *The Law of Workmen's Compensation* § 57.10 (1976). To measure all compensation in terms of lost earning capacity would create a disincentive for the medically disabled employee who is able and eager to return to work. To measure all compensation in terms of physical injury would penalize the economically disabled employee who is eager but unable to return to his earlier job. Congress has long recognized the trade-offs involved in fashioning an administratively feasible system of compensation which accommodates both of these interests within reasonable limits. *See, e. g.,* H.R.Rep.No. 729, *supra,* at 7–8; S.Rep.No. 836, *supra,* at 17–18. The system Congress adopted defines disability in terms of wage-earning capacity, *see* 33 U.S.C. § 902(10) (1976), but

there are always two facets to a compensable disability: physical injury *and* an inability to earn wages.

The majority's principal error lies in its efforts to reconcile the definition of disability with the existence of a schedule of benefits based solely on physical injury. As noted, confronted with this seeming disparity, the majority declares that the schedule is designed to compensate for an injury, thus contradicting its insistence on disability as an exclusively economic concept. The disparity the majority fears, however, does not exist, and thus the confusion surrounding its attempts at reconciliation is unnecessary. The existence of scheduled benefits solely based on physical injury is wholly consistent with the definition of disability solely based in economic terms because the purpose of the schedule is to set out *conclusive* presumptions on *lost earning capacity* for specified injuries. Professor Larson explains it this way:

> [The immateriality of lost wage earning capacity to determination of scheduled benefits] is not . . . to be interpreted as an erratic deviation from the underlying principle of compensation law—that benefits relate to loss of earning capacity and not to physical injury as such. The basic theory remains the same; the difference is that the effect on earning capacity is a conclusively presumed one, instead of a specifically proved one based on the individual's actual wage-loss experience. . . . To avoid . . . protracted administrative task[s], the apparently cold-blooded system of putting average-price tags on arms, legs, eyes, and fingers has been devised.

2 A. Larson, *supra*, § 58.11.

Hence the schedule of benefits is not only "a conclusive congressional presumption that certain injuries entitle a claimant to benefit on grounds that he is injured," it is a conclusive congressional presumption that the injury creates a disability entitled to the specified amount as compensation. "Con-gress has determined that a loss of wage-earning capacity *and its extent* are conclusively established when one of the enumerated physical impairments is proven to have arisen out of employment." *Travelers Insurance Co. v. Cardillo, supra,* at 144 (emphasis added). A conclusive presumption cannot be rebutted by any evidence, either of a greater or lesser loss of earning capacity; it is positive law. The majority's view transforms the presumption into one rebuttable by a claimant with evidence of lost earning capacity in excess of the scheduled benefit. Because heretofore the schedule itself represented final congressional judgments on the extent of the loss of earning capacity (rather than the effects of the physical injury), there is no reason why an employer cannot hereafter rebut the presumption of a scheduled loss with evidence of a lack of lost earning capacity. Hence my conclusion on the two-way street the majority paves through section 8(c)(21).

Confining a claimant who sustains an enumerated injury to the compensation contained in the schedule does no violence to the idea that disability is an economic concept. Instead it neatly accords with that idea. The majority's quarrel essentially is with Congress' determination to establish a conclusive presumption on the amount of wages a claimant has lost by devising a "cold-blooded system of putting average price-tags" on specific body members. Absent questions of constitutional dimension, however, it is not within our power to quarrel with congressional judgments.

### C

Finally the majority observes that the current trend in workmen's compensation law leans toward a notion that scheduled benefits are non-exclusive. Relying on state cases and Professor Larson's treatise, the majority concludes that its reading of section 8(c)(21) best accords with this trend.

Assuming for argument that such a trend exists and can be considered by this court, I question whether it has any application to

this situation. The examples Professor Larson uses all involve cases in which a claimant with a scheduled injury is found as a matter of fact to suffer either from a permanent total disability or from a permanent partial disability that *extends to other parts of the body. See* 2 A. Larson, *supra,* § 58.20 at 10–196. Thus, for example, if a claimant suffers a specified injury which renders him incapable of working at all, this trend favors him recovering for permanent total disability.

This was the situation involved in *American Mutual Insurance Co. v. Jones,* 138 U.S. App.D.C. 269, 426 F.2d 1263 (D.C. Cir. 1970), a case on which the majority relies. The claimant in *Jones* was "a 63-year-old man of limited intelligence whose only past work ha[d] been as a laborer." *Id.* 138 U.S.App. D.C. at 271, 426 F.2d at 1265. He sustained a work-related injury to his hand which resulted in the loss of use of that hand for all but the lightest work. He was unable to find work for several years. The employer argued that because the injury was scheduled, the claimant was confined to compensation under the schedule of benefits for permanent partial disability. The claimant, noting that the statute contained only a partial listing of injuries and provided that "[i]n all other cases permanent total disability shall be determined in accordance with the facts," 33 U.S.C. § 908(a), argued that nonmedical evidence was admissible to show that he in fact suffered from a disability permanent in quality and total in character. This court agreed.

The holding in *Jones* is consistent both with the idea of disability as an economic concept and with the express language of the statute relating to permanent total disability. The claimant there was not trying to recover for a heart attack or a hernia when his injury was to his hand; he was arguing that the injury to his hand *totally* disabled him in light of his age, work skills and experience, and ability to obtain employment. In *Jacksonville Shipyards, Inc. v. Dugger, supra,* the Fifth Circuit had no difficulty reconciling *Jones,* which it followed, and *Williams,* which held the schedule to be exclusive (in relation to the "other cases" clause) when only a permanent partial disability was involved. Section 8 says that the "facts"—medical and economic— determine permanent total disability; it conclusively presumes compensation for a scheduled injury permanent in quality and partial in character.

It is noteworthy that the two state cases the majority cites, *Van Dorpel v. Haven-Busch Co.,* 350 Mich. 135, 85 N.W.2d 97 (1957), and *American Tank & Steel Corp. v. Thomson,* 90 N.M. 513, 565 P.2d 1030 (1977), involved the same fact situation as *Jones.* The majority cites no cases applying the nonexclusivity trend to an "other cases" provision in a situation like the one at bar where the only finding of fact is that the injury was confined to the leg. As noted, Professor Larson does not relate the nonexclusivity trend to "other cases" provision. He notes several states which follow the trend, but some of these states have rejected extension of the nonexclusivity trend to other cases. *E. g., compare Jaynes v. Industrial Commission,* 7 Ariz.App. 78, 436 P.2d 172 (1968) (cited in 2 A. Larson, *supra,* § 58.20) (injury to leg which produces arthritis compensable under "other cases") *and Corbus Spring Service v. Cresswell,* 359 P.2d 219 (Okl.1961) (cited in 2 A. Larson, *supra,* § 58.20) (injury to leg which extends to back compensable under "other cases") *with La Rue v. Ashton Co.,* 2 Ariz.App. 101, 406 P.2d 451 (1965) (injury confined to leg compensable only under schedule) *and Thomas Concrete Products v. Robertson,* 485 P.2d 1054 (Okl.1971) (injury confined to specific scheduled member compensable under schedule only).

Although the majority construes Larson to grant the claimant the advantage in every scheduled injury case, Professor Larson himself understands that the existence of a schedule causes disadvantages in some situations. *See* 2 A. Larson, *supra,* § 58.13 at 10–174. Other treatises directly address

the "other cases" situation and render conclusions consistent with the plain meaning of the statute. *See, e. g.,* 11 *Schneider's Workmen's Compensation* § 2311 at 493 (3d ed. 1958) ("the ['other cases'] clause refers to a disability resulting from an injury to some portion of the body or usefulness of some physical function not mentioned in the schedule for specific loss or loss of use"); 99 C.J.S. *Workmen's Compensation* § 307 (1958) (an injury specifically covered by the schedule is not compensable under the "other cases" provision). Thus the trend the majority seeks to promote likely is inapposite in this situation.

Assuming for argument the trend has some application here, it is no substitute for legislation. We do not owe our allegiance to the latest fad, but to congressional intent. Thus whatever the current rage may be it supplies no warrant for ignoring the language of the statute. The majority's reasoning vests *new* congressional intent in a statute enacted fifty-two years ago. Congress has indicated that it will undertake efforts to conform workmen's compensation law "to the latest thinking in the area." H.R.Rep.No. 1025, *supra,* at 1; *see* S.Rep.No. 1081, *supra,* at 1. We should let Congress continue those efforts; we have no choice.

### VIII

The facts indicate that Cross sustained an injury to his leg alone. The plain meaning of the statute confines recovery for such an injury to the benefits contained in the schedule. Neither the text of the statute nor its legislative history supports the majority's interpretation of the "other cases" provision. Instead, the legislative history of the Longshoremen's Act and the Federal Employees' Compensation Act exhibits Congress' understanding that the "other cases" provision is confined to disabilities based on injuries not mentioned in the schedule. Every federal court that has considered the question has so concluded; no federal court has reasoned otherwise. The idea of "dis-

ability" as an economic concept is totally consistent with an interpretation of the statute which is faithful to its plain meaning. Nothing in the tenets of statutory construction or the trends in workmen's compensation law counsels a different construction. It is for Congress to make the policy judgments required to permit Cross to recover for lost wage earning capacity on the basis of an injury for which Congress has conclusively presumed the amount of that loss.

I would vacate the Board's order with directions to compensate Cross under section 8(c)(2), (19).