Eileen S. **LENAERTS**, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**Superior Ironworks and Liberty Mutual Insurance Company, Intervenors.**

No. 86–830.

District of Columbia Court of Appeals.

Argued Feb. 23, 1988.
Decided July 18, 1988.

---

Peter J. Vangsnes with whom Robert B. Adams, Washington, D.C., was on the brief, for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp.

Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Robert P. Scanlon, Rockville, Md., for intervenors Superior Ironworks and Liberty Mut. Ins. Co.

Before PRYOR, Chief Judge, and TERRY and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

This case involves two questions of interpretation of the District of Columbia Workers' Compensation Act of 1979, D.C.Code §§ 36–301 to –345 (1981 & 1987 Supp.) ("the New Act"). First, may a worker who suffers a "schedule award" disability partial in character but permanent in quality opt to recover the worker's actual lost wages, § 36–308(a)(3)(V), in lieu of the fixed amount of compensation provided in the act for such disability, § 36–308(a)(3)(A)–(U)? Second, where an injured worker paid on an hourly basis receives a job promotion during the 13–week period over which the worker's "average weekly wage" is calculated, is an adjustment to be made to the rule otherwise applicable under § 36–311(a)(4)? The Acting Director of the Department of Employment Services ("DOES") answered both questions in the negative. We affirm.

## I. The Facts

Petitioner Lenaerts began working for her employer, Superior Ironworks, as an apprentice ironworker in December 1979. On January 6, 1983, approximately two weeks before her injury, she completed her apprenticeship and became a journeyman ironworker, with a considerable hourly wage increase. On January 19, 1983, she suffered an on-the-job injury to her leg, which rendered her incapable of continuing in her new position and occasioned a considerable actual wage loss.

Since she suffered a permanent partial loss of use of her leg, she was entitled to a

"schedule award"[1] providing her compensation based on a fraction of her average weekly wage for a fixed period of weeks. Such an award is made without regard to whether any actual wage loss occurred. D.C.Code § 36–308(a)(3)(B), (S).

However, Lenaerts took the position before DOES, as she does before us, that she was entitled to opt, alternatively, to receive compensation measured by her actual wage loss, pursuant to § 36–308(a)(3)(V). That section appears in the New Act following the enumeration of the various sorts of injuries giving rise to schedule awards and provides:

> Other cases. In this class of disability the compensation shall be sixty-six and two thirds (66⅔) percent of the employee's wage loss, payable during the continuance of such disability. Wage loss shall be the difference between the employee's average weekly wage before becoming disabled and the employee's actual wages after becoming disabled.[2]

She also asserted that since she had received a promotion from apprentice to journeyman ironworker during the 13–week period over which the average weekly wage is computed for a worker paid on an hourly, daily or output basis, only her wages in her new position should be used in the computation under § 36–311(a)(4).

The Acting Director ruled against Lenaerts on both counts. (For informational purposes, a copy of the Acting Director's Final Compensation Order is annexed to this opinion.) Petitioner seeks review in this court. D.C.Code § 36–322(b)(3).

## II. The Right of Election

Ordinarily, this would be a straightforward case. We are dealing here with an interpretation of a statute by the administrative agency responsible for its execution, to which we pay deference. We have applied this doctrine to DOES interpretations of the New Act. *See, e.g., Reichley v. District of Columbia Department of Employment Services,* 531 A.2d 244, 247–48 (D.C.1987), in which we said, quoting from *Lee v. District of Columbia Department of Employment Services,* 509 A.2d 100, 102 (D.C.1986):

> [W]e must give great weight to any reasonable construction of a regulatory statute that has been adopted by the agency charged with its enforcement. The interpretation of the agency is binding unless it is plainly erroneous or inconsistent with the enabling statute. Consequently, we sustain the agency decision even in cases in which other, contrary, constructions may be equally as reasonable as the one adopted by the agency. [Citations omitted.]

Here, as Lenaerts readily concedes, the Acting Director's interpretation is perfectly reasonable on the face of the statute. Her argument is that when consideration is given to the state of the case law existing at the time of the passage of the New Act, the only reasonable interpretation of the Council's intent in adopting the language under review is in her favor.[3]

Lenaerts's argument is based principally on the existence of a case decided in the

---

1. We use here the terminology of the Acting Director. *See* annexed Final Compensation Order at 17 n. 3. The Supreme Court in its *PEPCO* decision discussed *infra* used the phrase "schedule benefits."

2. The initial heading "Other cases" appears in the official version of the New Act, D.C.Law No. 3–77, § 9(c)(22), 1979–1980 D.C.Stat. 322, 328, but is omitted in the codification. In cases of conflict between the version published in the D.C. Statutes-at-Large and the codification, the former controls. *Burt v. District of Columbia,* 525 A.2d 616, 619 (D.C.1987).

3. Resort to such aids as prior judicial interpretations may be viewed as relevant only if the statute is unclear on its face. "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms." *Washington v. United States,* 498 A.2d 247, 248 (D.C.1985) (quoting from *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Although it could well be maintained that the language here is capable of only one interpretation, the apparent view of the Supreme Court majority in *PEPCO v. Director, OWCP,* 449 U.S. 268, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980), *see* discussion *infra,* we will assume for purposes of this decision

District of Columbia shortly before the Council adopted the Act. *Potomac Electric Power Co. (PEPCO) v. Director, Office of Workers' Compensation Programs (OWCP)*, 196 U.S.App.D.C. 417, 606 F.2d 1324 (1979), *rev'd*, 449 U.S. 268, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980). There, the court was interpreting a provision of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA") which at that time effectively served as the workers' compensation law for the District of Columbia.[4] The provision in question, 33 U.S.C. § 908(c), was the model for § 36–308(a)(3) of the New Act and for present purposes may be considered as identical in wording.[5] The court, in a 2–1 decision, adopted the interpretation urged by Lenaerts before us. Furthermore, Lenaerts asserts, in a number of decisions between 1975 and 1980, the Benefits Review Board had similarly interpreted 33 U.S.C. § 908(c).[6]

Against this legal background, Lenaerts invokes the rule of statutory construction that where a legislature of a state adopts a statutory provision which is modeled after a federal statute or the statute of another state, it is presumed to adopt prior constructions of the statute in the jurisdiction in which it originated. 2A SUTHERLAND, STATUTORY CONSTRUCTION § 52.02 (N. Singer 4th ed. 1984).

The Supreme Court has applied this rule to adoptions by the Congress of statutes drawn from state legislative enactments, *see, e.g., Joines v. Patterson,* 274 U.S. 544, 549, 47 S.Ct. 706, 708, 71 L.Ed. 1194 (1927) (citing *Willis v. Eastern Trust & Banking Co.,* 169 U.S. 295, 307, 18 S.Ct. 347, 352, 42 L.Ed. 752 (1898)),[7] and we have at times invoked this rule with respect to enactments by the D.C. Council of provisions borrowed from federal statutes. *See Hughes v. District of Columbia Department of Employment Services,* 498 A.2d 567, 571 n. 8 (D.C.1985) (a New Act case, citing *Whitt v. District of Columbia,* 413 A.2d 1301, 1303–04 (D.C.1980)).[8] Thus, argues Lenaerts, with the construction she urges being "well-established" at the time

4. In 1928, Congress provided that the newly enacted 1927 LHWCA, now 33 U.S.C. §§ 901–950 (1982), would be applicable to all workers employed in the District of Columbia, D.C.Code § 36–501 (1973). Conceptually, the 1928 Act has been viewed as distinct from the LHWCA. *O'Connell v. Maryland Steel Erectors, Inc.,* 495 A.2d 1134 (D.C.1985).

5. All parties agree before us (although apparently not before the Acting Director, *see* attached Order at 4 n. 11) that with respect to the issue in question the differences in language between the LHWCA provision and the comparable provision in the New Act are irrelevant. We do not differ from this view.

6. The Benefits Review Board, a component of the U.S. Department of Labor, is the administrative entity responsible for processing all claims under the LHWCA, including those arising in the District under the 1928 Act. 33 U.S.C. § 921 (1982).

7. *But cf. Yates v. United States,* 354 U.S. 298, 309, 77 S.Ct. 1064, 1072, 1 L.Ed.2d 1356 (1957) ("The 'general rule that adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretations of the wording ... is a presumption of legislative intention ... which varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted and the presence or lack of other indicia of intention.' ") (quoting *Carolene Products Co. v. United States,* 323 U.S. 18, 26, 65 S.Ct. 1, 5, 89 L.Ed. 15 (1944)).

8. In *Hughes,* we cited to interpretations of the LHWCA from the Fourth and Seventh Circuits.

In several cases arising under the New Act, we have simply asserted that cases interpreting the LHWCA are persuasive authority in interpreting comparable provisions of the New Act, with no direct reference to the bearing of such prior cases on putative legislative intent. *See Porter v. District of Columbia Department of Employment Services,* 518 A.2d 1020, 1024 (D.C. 1986) (dissenting opinion) (The New Act "is based on the federal [LHWCA], and cases interpreting the federal statute provide persuasive authority in interpreting the D.C. Act"); *Grayson v. District of Columbia Department of Employment Services,* 516 A.2d 909, 911 n. 2 (D.C.1986) ("D.C. Circuit cases interpreting provisions of the Longshoreman's Act provide persuasive authority in interpreting virtually identical provisions of the Workers' Compensation Act"); *Dunston v. District of Columbia Department of Employment Services,* 509 A.2d 109, 111 n. 2 (D.C. 1986).

of the adoption of the New Act, the District of Columbia Council must be presumed to have intended to adopt that construction.

On occasion, we have resorted to another analogy interpreting the New Act, that of a legislature reenacting language from its own preexisting statute. *See* 2A SUTHERLAND, STATUTORY CONSTRUCTION, *supra*, § 49.09. In *Washington Metropolitan Area Transit Authority v. District of Columbia Department of Employment Services*, 506 A.2d 1127 (D.C.1986), a question existed as to the meaning of the phrase "accidental injury" as used in the New Act. D.C.Code § 36–301(12) (1981). The LHWCA had contained the same phrase, 33 U.S.C. § 902(2), and we noted that decisions under the LHWCA had repeatedly held that the requirement of "accidental injury" was satisfied "if something unexpectedly goes wrong within the human frame." We then said:

> In enacting [the New Act], the Council made no change to the language of the [LHWCA] regarding "accidental injury." This course of action leads us to conclude that the Council was satisfied with the interpretation the courts had placed on those words. *See Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978) (when legislature reenacts statutory provision it is deemed to adopt prior judicial interpretations); *see also* 2A Sutherland Stat. Const. § 49.09 (4th ed. 1984) (when legislature reenacts earlier statute, presumption is that legislature approves prior judicial constructions of that statute).

*Id.* at 1129.

 However, under either analogy, as Lenaerts's argument itself indicates, the presumption operates only where the judicial interpretation of the existing law is firm. *See, e.g., Hartford Accident & Indemnity Co. v. Hoage*, 66 App.D.C. 154, 156, 85 F.2d 411, 413 (1936) (citing, *inter alia, Capital Traction Co. v. Hof*, 174 U.S. 1, 19 S.Ct. 580, 43 L.Ed. 873 (1899) ("a known and settled" construction of a state law is deemed adopted by Congress)); *United States v. Raynor*, 302 U.S. 540, 551–52, 58 S.Ct. 353, 358–59, 82 L.Ed. 413 (1938) ("One [circuit court] decision construing an act [later codified] does not approach the dignity of a well settled interpretation").[9]

 This presents a serious problem to Lenaerts's argument. The very decision relied upon by Lenaerts was not even final at the time the D.C. Council acted. The chronology of events went as follows. On February 15, 1979, the first draft of what turned out to be the New Act was introduced in the D.C. Council. On August 24, 1979, the D.C. Circuit rendered its split opinion.[10] On February 19, 1980, the Supreme Court granted certiorari in the case. On May 6, 1980, the D.C. Council passed the New Act. Thus, at the moment of passage, the correctness and finality of the D.C. Circuit's opinion had already been drawn into question.[11] Indeed, on December 15, 1980, the Supreme Court, by an 8–1 vote, reversed the D.C. Circuit, declaring that the "compelling statutory language" required an interpretation that the schedule award provisions were exclusive and that no election to seek actual wage loss existed. *PEPCO v. Director, OWCP, supra.* This was the very interpretation adopted by the Acting Director here.

---

9. Indeed, it is said, with respect to borrowed statutes, that "only the decisions of the court of last resort are normally adopted with the statute." 2A SUTHERLAND, STATUTORY CONSTRUCTION, *supra*, § 52.02, at 524; *see, e.g., Zerbe v. State*, 583 P.2d 845, 846 (Alaska 1978) ("only the settled interpretations of the highest court of the other jurisdiction ... are presumptively intended by the lawmaker to be adopted").

10. The Acting Director's statement that the decision was issued on March 22, 1979, refers to the date of oral argument before the court, not the date of decision. Attached Order at n. 18.

11. Lenaerts argues that since the committee draft of the New Act was approved on Jan. 29, 1980 and no amendments were made thereafter, the grant of certiorari in February should be disregarded. One might note, to the contrary, that the Council had approximately two and a half months within which to make modifications to the wording once the *PEPCO* holding was placed in doubt by the granting of certiorari.

This existing uncertainty and lack of finality within our jurisdiction would be enough in itself to defeat Lenaerts's argument in the situation presented here. However, there is an added consideration, applicable if the view is taken that the relevant legal universe is not only cases within the District of Columbia but rather all case law interpreting the LHWCA.[12] Even at the time the Council acted, the opinion in *PEPCO* did not stand alone in the case law. Thirteen years earlier the Fifth Circuit had ruled precisely to the contrary in *Williams v. Donovan*, 367 F.2d 825 (5th Cir.1966), *cert. denied*, 386 U.S. 977, 87 S.Ct. 1174, 18 L.Ed.2d 139 (1967).[13] Indeed, as the Supreme Court noted in *PEPCO*, during the first half century of administration of the LHWCA, federal tribunals had consistently construed the schedule awards provision as exclusive. It was not until 1975 that the Benefits Review Board began applying a contrary interpretation. 449 U.S. at 277, 101 S.Ct. at 514.

In short, we cannot characterize the existing legal situation with respect to the interpretation of 33 U.S.C. 908(c) in Lenaerts's favor as being "well-established" at the time of the New Act's passage by the D.C. Council,[14] certainly not enough to mandate a conclusion that the D.C. Council must have so intended in its use of what the Supreme Court itself termed "compelling statutory language" to the contrary. 449 U.S. at 284, 101 S.Ct. at 517.[15]

### III. Computation of Average Weekly Wage

■ Lenaerts's second challenge to the DOES order is to the method used for computation of a claimant's average weekly wage. The Acting Director applied in accordance with its terms the provision of the New Act governing the situation before him, D.C.Code § 36–311(a)(4) (1981), which reads:

> If at the time of the injury the wages are fixed by the day, hour, or by the output of the employee, the average weekly wage shall be computed by dividing by 13 the total wages the employee earned in the employ of the employer in the 13 consecutive weeks immediately preceding

**12.** Lenaerts suggests that since the LHWCA and the 1928 Act are conceptually distinct, *see* note 4 *supra*, the D.C. Circuit opinion should be the only judicial pronouncement considered relevant at the time of the adoption of the Act. However, this overlooks the role of the Supreme Court as arbiter of disputes arising both under the LHWCA and the 1928 Act. That Court made no distinction between the two acts in its interpretations. *See PEPCO, supra; WMATA v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). In construing local worker's compensation cases technically arising under the 1928 Act, courts cited interpretations nationwide of the LHWCA, albeit perhaps as persuasive and not necessarily binding authority. *See, e.g., DiNicola v. George Hyman Construction Co.*, 407 A.2d 670 (D.C.1979); *Travelers Insurance Co. v. District of Columbia*, 382 A.2d 269 (D.C.1978); *Hastings v. Earth Satellite Corp.*, 202 U.S.App.D.C. 85, 628 F.2d 85 (1980). Likewise, in interpreting provisions of the New Act which were taken from the LHWCA/1928 Act, although understandably more commonly invoking our local circuit court cases, we have freely cited to opinions elsewhere. *See Dunston, supra,* note 8, 509 A.2d at 111 (citing Third and First Circuits); *Hughes, supra,* 498 A.2d at 571 n. 8 (citing Fourth and Seventh Circuits). *But cf. Grayson, supra* note 8, 516 A.2d at 911 n. 2 (D.C.Circuit cases provide persuasive authority). Indeed, Lenaerts herself in arguing the settled state of the law at the time of adoption of the New Act cites decisions of the Benefits Review Board under the LHWCA arising throughout the country.

**13.** The circuit court opinion was a per curiam affirmance of the extended district court opinion at 234 F.Supp. 135 (E.D.La.1964).

**14.** The unsettled state of the applicable law with respect to the issues involved in this appeal may be contrasted with the situation in *Meiggs v. Associated Builders, Inc.*, 545 A.2d 631, No. 85–577 (D.C.1988). In *Meiggs*, the controlling decision, rendered by the very court that would be interpreting the same language in the New Act, had become final, and was in accord not only with other cases arising out of the 1928 Act, but also with circuit court authority under the LHWCA. *See Meiggs,* at n. 9. Furthermore, here, unlike in *Meiggs*, we are reviewing an agency's interpretation of a statute that it is responsible for administering.

**15.** Apart from the questions of existing judicial interpretation, we in general agree with the analysis of the Acting Director that the legislative history as such tends, if anything, to support his interpretation.

the injury. If the employee has been in the employ of the employer less than 13 weeks, then his "total wages" referred to in the preceding paragraph shall be the amount he would have earned had he been so employed by the employer the full 13 calendar weeks immediately preceding the injury and had worked, when work was available to other employees, in a similar occupation.

A correct reading of the provision, Lenaerts asserts, would be to consider that she had been in the "employ" of Superior Ironworks as a journeyman ironworker for only two weeks. Furthermore, she points out that workers paid on a monthly or weekly basis receive compensation based on their pay at the time of the injury, regardless of what the pay might have been previously. D.C.Code § 36–311(a)(1), (2).

These and other related points made by Lenaerts may be good policy arguments directed to the legislature. However, in light of the principles of review of administrative interpretations of regulatory statutes discussed above, we cannot fault the agency for applying the plain language of the subsection in question.[16] No contrary judicial interpretations have been called to our attention. Indeed, the legislative history, to the extent it sheds any light, supports the Acting Director's interpretation. The LHWCA includes a provision which allows for adjustment of the calculation method where appropriate, such as, perhaps, here. 33 U.S.C. § 910(c). At one point in the legislative process leading to adoption of the New Act, the average weekly wage calculation provision was questioned in the course of a Committee report but left unchanged. The same report also provided a substitute form of the act which would have used language similar to 33 U.S.C. § 910(c), but that language was not included in the New Act as passed.[17]

Accordingly, the order appealed from is in all respects

*Affirmed.*

16. *See* note 3, *supra.*

17. Report from Wilhelmina J. Rolark, Chairperson, Council of the District of Columbia Com-

## GOVERNMENT OF THE DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES

Office of the Director

Employment Security Building

500 C Street, N.W.

Suite 600

Washington, D.C. 20001

H & AS No. 84–174

OWC No. 0010974

Eileen S. Lenaerts, Claimant,

Liberty Mutual Insurance Company,

Employer/Carrier.

## FINAL COMPENSATION ORDER

I. *Preliminary Statement*

This proceeding arises out of a claim for workers' compensation benefits filed pursuant to the provisions of the District of Columbia Workers' Compensation Act of 1979, as amended, D.C.Law 3–77, D.C.Code § 36–301 *et seq.* (1981 Ed. & Supp.) (hereinafter, the Act).

On January 25, 1985, Hearing Examiner Brownell recommended that Claimant's request for an award of permanent partial disability benefits based on her wage loss be granted. In a Proposed Compensation Order dated January 30, 1985, the Deputy Director for Labor Standards adopted that recommendation.

Employer filed exceptions and written argument on February 12, 1985. Claimant filed exceptions and written argument on February 15, 1985. On February 21, 1985, Claimant filed in opposition to Employer's exceptions. On March 7, 1985, the Hartford Accident & Indemnity Company filed a

mittee on Public Services and Consumer Affairs, January 16, 1980, at 14 (and Bill No. 3–106, at 42, appended as an exhibit thereto).

motion for leave to file brief as Amicus Curiae and a brief. Claimant opposed Hartford Accident's motion in an opposition filed March 22, 1985.

While the exceptions in the proceeding have been pending, the Hearing Examiners have issued other decisions involving the same issue of law. Exceptions have been filed in most of those proceedings.[1] Related issues have arisen in several other proceedings in which exceptions have been filed.[2] Until this matter is finally resolved by the Court of Appeals, it is probable that there will be many other proceedings presenting the issue of the exclusivity of scheduled awards.

In considering this matter, I have accepted for review all briefs, letters and copies of cases involving the schedule awards issue.

## II. *Background*

On December 14, 1979, Claimant began working for Employer as an iron worker apprentice. On January 6, 1983, approximately two weeks before her injury, Claimant became a journeyman iron worker. On the day of her accident, January 19, 1983, Claimant was welding in a beam while standing on a scaffold. In an attempt to hand a co-worker a tool left on a beam, Claimant fell off the scaffold. Her leg got caught in a security fence and was later diagnosed as permanently damaged.

As a result of her injuries Claimant remained off work until October 31, 1983, when she asked to return to learn metal drafting. From that date until the date of the hearing, Claimant has worked as a draftsman apprentice. As a draftsman apprentice, Claimant earns approximately $300.00 a week. As a journeyman iron worker, Claimant was earning more than $600.00 per week. Thus, subsequent to her injury, Claimant has experienced a significant wage loss.

The medical evidence is not in dispute. Both Employer's and Claimant's physicians have suggested that Claimant's knee injury has reached maximum medical improvement and that Claimant suffers some degree of permanent residual pain and discomfort to the knee. The residuals have prevented Claimant from resuming her full-time duties as an iron worker journeyman since that position requires climbing, stooping, crawling, carrying heavy objects and performing other activities which the residual pain will not permit.

The dispute arose with respect to the type of benefits to which Claimant is entitled and the proper method for calculating Claimant's benefit level. At the hearing Claimant argued that since her permanent partial disability meets the requirements of two different benefit provisions of the Act, she may elect to have her benefits paid under either provision. Claimant also argued that her pre-injury wages should be confined only to those wages which she earned as a journeyman and should not include her earnings as an apprentice even though in the thirteen weeks prior to the injury, Claimant had worked as both an apprentice and a journeyman. Employer, however, maintained that since Claimant had suffered an injury to a specific bodily part listed under the schedule award provisions of the Act,[3] benefits to Claimant must

**1.** *Rychlik v. W.M.A.T.A.,* H & AS No. 84–192, OWC No. 0000340; *Martin v. Anning and Johnson Co.,* H & AS No. 84–274, OWC No. 0010948; *Crawford v. Charles H. Tompkins Co.,* H & AS No. 84–240, OWC No. 0012619; *Carafa v. Standard Acoustics, Inc.,* H & AS No. 84–373, OWC No. 0010618; *Price v. Pierce Associates Inc.,* H & AS No. 84–196, OWC No. 0012744.

**2.** *Kovac v. Avis Leasing,* H & AS No. 84–177, OWC No. 0000729; *Fawley v. EGS Masonry,* H & AS No. 84–296, OWC No. 0013335; *Balderamos*

*v. Marriott Corp.,* H & AS No. 84–302, OWC No. 0024834; *Smith v. W.M.A.T.A.,* H & AS No. 83–32, OWC No. 0000788.

**3.** §§ 9(c)(1)–9(c)(21) of the Act are commonly known as the "schedule award" provisions. Payments under these provision are of limited duration and are made whether or not an injured employee experiences any wage loss. Thus, technically, these schedule awards are in the nature of injury awards rather than disability awards.

be paid in accordance with those provisions exclusively and cannot be paid under the wage loss provision.

The Hearing Examiner concluded that Claimant may elect either compensation under §§ 9(c)(2) and 9(c)(19) of the Act for her injury to the leg or compensation under § 9(c)(22) for her wage loss. The Hearing Examiner also held that in determining Claimant's average weekly wages, one should use Claimant's entire wages for the full thirteen week period prior to the injury even though during that time Claimant had worked as both an apprentice and a journeyman.

Both Claimant and Employer object to the Hearing Examiner's conclusions. Claimant maintains that, when she began working as a journeyman, she assumed new employment with Employer and that her wages should therefore be calculated on the basis of that new employment. Employer objects to the Hearing Examiner's interpretation of the Act as permitting an election between the wage loss provision and schedule provisions of the permanent partial disability section.

The discussion which follows addresses first the issue of the availability of the wage loss provision, § 9(c)(22), to those employees whose injuries are confined to bodily parts which are listed in §§ 9(c)(1)–9(c)(21) of the Act and which are therefore compensable under schedule awards provisions. Next is a discussion of the appropriate method for calculating the average weekly wages of an employee who changes positions with his employer during the thirteen week period immediately preceding the injury. For purposes of the discussion, the term "claimants" and "employers" are used in lieu of "Claimant" and "Employer," respectively. The use of those terms will permit the discussion of the arguments made in similar cases.

## III. Discussion

Under § 9(c) of the Act, there are two methods prescribed for computing the compensation benefits due an employee who suffers an injury permanent in quality and partial in character.[4] If the employee suffers an injury listed in §§ 9(c)(1)–(21), the employee receives 66⅔ of his average weekly wage for a specified number of weeks. If the employee suffers an injury which results in a wage loss, he receives 66⅔ percent of the difference between his pre-injury and post-injury wages.[5]

The language and structure of § 9(c) of the Act is substantially similar to § 8(c) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. 901 et seq. (hereinafter referred to as the LHWCA). Except for the one major difference between these

---

**4.** § 9(c) of the Act reads in pertinent part as follows:

(c) PERMANENT PARTIAL DISABILITY. In case of disability partial in character but permanent in quality, the compensation shall be sixty-six and two thirds (66⅔) percent of the employee's average weekly wages which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with subsection (b) or subsection (d) respectively, and shall be paid to the employee, as follows:

\* \* \* \* \* \*

(2) Leg lost, two hundred and eighty-eight (288) weeks' compensation.

\* \* \* \* \* \*

(19) Partial Loss or Partial Loss of Use. Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member.

\* \* \* \* \* \*

(22) Other Cases. In this class of disability the compensation shall be 66⅔ percent of the employee's wage loss. . . .

**5.** In this case, Claimant suffers a 10–30% loss of use of the leg, R.C.O. at 3, n. 1, has an average weekly wage of $468.97, Id. at 6, and a wage loss of $168.97, Id. at 7. Under the schedule provisions of §§ 9(c)(2) and (19), Claimant would receive $312.62 a week for either a minimum 28.8 weeks, for a total of approximately $9000.00, or a maximum 86.4 weeks for a total of approximately $27,000. Under the wage loss provision of § 9(c)(22) Claimant would receive $112.64 per week in disability benefits for the remainder of her working life. Claimant is 35 years old. Should she work for the next twenty-five years, her wage loss benefits would exceed $140,000.

provisions,[6] it is clear that the Council borrowed § 9(c) of the Act from § 8(c) of the LHWCA.

It is a well-settled principle of statutory construction that where one jurisdiction borrows language from the statute of another jurisdiction, the borrower is deemed to have adopted as well the prior judicial constructions of the borrowed language. 2A Sutherland, Statutory Construction § 52.02 (4th ed. 1984). Only the known and settled constructions of the language existing prior to enactment by a borrowing jurisdiction raise the presumption. *Hartford Accident & Indemnity Co. v. Hoage*, 66 App.D.C. 154, 156, 85 F.2d 411, 413 (1936). There is not, moreover, a presumption that a borrowing jurisdiction intended to adopt the subsequent constructions of the statutory language it has borrowed. *Whitt v. District of Columbia*, 413 A.2d 1301, 1304 (D.C.1980).

Claimants contend that, at the time the Council adopted the Act on final reading, May 6, 1980, there was but one construction of the LHWCA in this jurisdiction and that both the Benefits Review Board (BRB)[7] and the D.C. Circuit[8] had construed § 8(c) of the LHWCA to permit an employee to elect the type of permanent partial disability benefits he deemed appropriate to his circumstances. Claimants argue that, in light of the existence of that construction, a presumption arises that the Council intended to adopt that construction, a construction which would permit an employee to make an election of either scheduled or wage loss permanent partial disability benefits.

Employers counter with the argument that prior to the U.S. Supreme Court's construction, the interpretation of § 8(c) of the LHWCA by the D.C. Circuit was never the settled construction of the LWHCA for two reasons. First, the Supreme Court had granted certiorari to review the decision by the D.C. Circuit prior to Council adoption of the language. Second, the D.C. Circuit's construction of the LHWCA stood directly contrary to the interpretation of the 5th Circuit. *See Williams v. Donovan*, 234 F.Supp. 135 (E.D.La.1964), aff'd 367 F.2d 825 (5th Cir.1966), *cert. denied*, 386 U.S. 977, 87 S.Ct. 1174, 18 L.Ed.2d 139 (1967). Thus, maintain employers, one must determine Council intent without the assistance of a presumption.

Given the pendency of this issue before the Supreme Court at the time of Council enactment of the Act and the fact that the construction by the D.C. Circuit contravened fifty years of treating payments for schedule injuries as mutually exclusive of payments for a permanent partial wage loss, it cannot be realistically argued that the D.C. Circuit's construction was the known and settled construction of § 8(c) of the LHWCA at the time of Council passage of the Act. There is no reason to presume, therefore, that the Council intended to enact the construction of the D.C. Circuit.[9]

Employers suggest, moreover, that one does not even look to legislative intent if the words of the statute are plain on their face. If the meaning of statutory language is clear and unambiguous, and does not lead to absurd results, such language must be given effect regardless of the in-

---

**6.** Under the wage loss provision of the Act, § 9(c)(22), an employee is entitled to receive 66⅔ percent of the difference between his pre-injury wages and his post-injury wages. Under § 8(c)(21) of the LHWCA, an employee receives 66⅔ percent of the difference between his average weekly wages and his wage earning capacity.

**7.** *Cross v. PEPCO*, 7 BRBS 10 (1977).

**8.** *Potomac Electric Power Company v. Director, Office of Workers' Compensation Programs*, 606 F.2d 1324 (D.C.Cir.1979).

**9.** In *Price, supra*, claimant cites decisions of the Benefits Review Board (BRB) in support of his argument that prior settled constructions of the LHWCA permitted benefits. Apparently, it is his view that administrative interpretations as well as judicial constructions of the LHWCA may raise the presumptions. Since the BRB is not a policy-making body whose constructions are accorded special deference by the courts, I do not view the opinions of that body as settled constructions sufficient to raise the presumption in this matter.

tent of the legislature. *U.S. v. Clark*, 454 U.S. 555, 102 S.Ct. 805, 70 L.Ed.2d 768 (1982) *United States v. Young*, 376 A.2d 809 (D.C.1977). Thus, if the language of the Act is plain on its face, one need not resort to legislative history or other assistance to determine the Council's intent.

In *PEPCO v. Director, OWCP, etc.*, 449 U.S. 268, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980), the Supreme Court found the language of § 8(c) of the LHWCA not only clear, unambiguous and plain on its face but "compelling" as well. The Court cited the language of paragraph 8(c)(21) of the LHWCA as foreclosing the possibility that an employee could select either a schedule award or a permanent partial wage loss award. The Court said that the words "other cases" and "in all other cases" apply to injuries "not included within the list of specific injuries." *Id.* at 274, 101 S.Ct. at 512. Thus, the Court agreed with D.C. Circuit Judge MacKinnon's dissent when he said that "other cases" refers to cases different or distinct from the ones already mentioned. 606 F.2d at 1332. Since heart attack cases, hernia cases, back cases, mental cases, cancer cases and the like were not specifically listed, the catch all phrase "other cases" was intended, according to Judge MacKinnon, to provide for disabilities which were the result of such injuries or diseases. *Id.* The Supreme Court held that the language "other cases" was not susceptible to any other reading.

The Court also noted that in cases where there was an injury to a specified bodily part, the language of § 8(c) of the LHWCA not only prescribed the method of computing benefits but mandated the payment of those benefits as computed. The "other cases" provision of § 8(c)(22) contains no similar mandate; it only prescribes the method of computing appropriate benefits levels. The Court said that, given the man-

date to pay in schedule cases, it was not free to read that provision as authorizing an election of an alternative remedy.

The arguments in opposition to the Supreme Court's view that the language is plain on its face are not persuasive. The Hearing Examiner merely states that the statutory language is not "clear on its face" and adds that "no other section of the Act ... defines these terms." The Hearing Examiner does not, however, justify her conclusion that the language is not clear on its face or that the terms need definition.[10]

Claimants, moreover, have not offered arguments which attempt to demonstrate that the words of § 9(c) are capable of being interpreted in a manner different from the Supreme Court's interpretation. Instead, Claimants have relied on the argument that since the interpretation by the D.C. Circuit of § 8(c) of the LHWCA was in effect prior to Council adoption of identical language, the Council must have intended its incorporation into the Act.

Nowhere in its opinion, moreover, did the D.C. Circuit, in any meaningful way, take issue with the notion that the Act was not clear on its face. The D.C. Circuit began its analysis not with the notion that statutory language, clear on its face, must be given effect; rather, the Court said that analysis must begin with the proposition that workers' compensation statutes are remedial in nature and should not be construed so as to bring about incongrous results. 606 F.2d 1327. In the opinion of the D.C. Circuit, compensating equally employees who suffer identical schedule injuries having different economic consequences was incongruous. To Judges Wright and Swygert, "other cases" had to be those cases in which an employee could prove wage loss. Only by reading the words in that manner could one avoid the

---

10. It is true that the Act does not specifically state that there are four "classes" of disability: (1) permanent total, (2) temporary total, (3) permanent partial and (4) temporary partial. Yet, the very structure of § 9 makes it clear that these four categories are classes of disability

within the meaning of § 9(c)(22). *See,* Judge Skelly Wright's majority opinion which notes that the LHWCA's compensatory scheme encompasses four "classes of disability." 606 F.2d at 1337.

incongruous results. It was not the view of the D.C. Circuit that the language of the LHWCA was unclear or ambiguous; instead, it was its view that the results of applying that language, however plain on its face, were undesirable.[11]

Whatever the results, reading the Act as written requires rejection of the argument that the language of the Act permits an election of either schedule or permanent partial disability wage loss benefits. Structurally, § 9(c) is divided into twenty-two paragraphs. The first sixteen make reference to various parts or organs of the body and prescribe a period of benefit payments for the loss or loss of use of those organs. The next four paragraphs, skipping the paragraph on disfigurement, outline procedures for dealing with injuries to two or more of the specified bodily parts or for computing benefits when there is less than a total loss of such parts. Moreover, each paragraph containing sentences begins with a heading,[12] all of which, except for paragraph 9(c)(22), either identify a specific body or describe the procedure used for handling variations of injuries to the bodily parts. Paragraphs 9(c)(17), 9(c)(18), 9(c)(19), and 9(c)(21) either modify or clarify the benefits due an employee suffering an injury specified in the preceding paragraphs. Each of those paragraphs contains language which makes it clear that that paragraph pertains to the specific injuries.

Yet, in paragraph 9(c)(22) the language not only fails to refer to the previously specified injuries but begins with the phrase "other cases." Moreover, paragraph 9(c)(22) does not modify or explain the proper calculation of benefits for specified injuries; it sets up a completely different method of computing benefits in other cases. Had the Council sought to have "other cases" mean "in cases where there is a wage loss," the Council, consistent with the language in paragraph 9(c)(21), for example,[13] could have easily prefaced the substance of the paragraph with such language as, "in cases where there is a wage loss." Since the Council did not include such language and since the structure of § 9(c) otherwise lends itself to the notion that § 9(c)(22) refers to injuries not previously specified, I have concluded that paragraphs 9(c)(1)–(21) and paragraph 9(c)(22) provide for mutually exclusive benefits.

The history of the Act, as well as its language and structure, supports that conclusion. While, technically speaking, the Act is not a product of only one Council committee,[14] reports from both the Committee on Housing and Economic Development (hereinafter referred to as the HED Committee) and the Committee on Public Services and Consumer Affairs (hereinafter referred to as the PSCA Committee) support the view that the Council intended that the permanent partial wage loss provision,

**11.** The language of § 8(c)(21) of the LHWCA is not identical to § 9(c)(22) of the Act. The LHWCA provision begins, "Other Cases: In all other cases in the class of disability ..." The comparable provision of the Act begins, "Other Cases. In this class of disability ..." Thus, the Act does not contain the words "In all other cases." While claimants contend that this difference in language imports a difference in meaning, nothing in the legislative history of the Act supports that view. The Council could well have viewed the words "in all other cases" as superfluous after the paragraph label "Other Cases."

**12.** As the Hearing Examiner pointed out, the paragraph label "Other Cases" is missing from the codified version of the Act. The missing label is not the product of a transcribing error. The codifiers have taken the liberty to eliminate or modify most of the section and paragraph

labels throughout the Act and to renumber the Act's provisions. That practice has resulted in several errors in the codified version. For an official version of the Act, one may consult the D.C. Statutes–At–Large, 1979–1980 Compilation, 322 *et seq.*

**13.** In § 9(c)(21), the Council began the paragraph, "In any case in which there shall be a loss of, or loss of use of, more than one (1) member or parts of more than one (1) member set forth in paragraph (1) to (19) ..." Thus, the Council knew how to carve out exceptions to and modifications of payments under the schedule.

**14.** Bill 3–106 was referred to the HED Committee for report and recommendation and to the PSCA Committee for comment. The ultimate product reflects the wishes of both committees.

§ 9(c)(2), would apply to non-scheduled injuries only. A brief review of the events of HED Committee, moreover, reveal that the key Council committee was aware of the issue.

On February 15, 1979, Councilmember Willie Hardy introduced Bill 3–106, the District of Columbia Workers' Compensation Act of 1979 (hereinafter referred to as the Bill). The Bill's permanent partial disability provision differed from the ultimate provision in the Act in two paragraphs. They read as follows:

(22) Other Cases. In this class of disability the compensation shall be 66⅔ percent of the employees wage loss. Wage loss shall be the lesser of:

(a) The difference between the employee's average weekly wages before becoming disabled, and the employee's actual wages thereafter; or

(b) The difference between the employee's average wages before becoming disabled, an the employee's wages capable of being earned thereafter.

(23) With respect to any period after payments under paragraph (c)(1) through (e)(21) [sic] have terminated, compensation shall be paid as provided in subsections (a) and (b) of this section if the disability is total, or, if the disability is partial, 66⅔ percent of the employee's wage loss. Wage loss be the lesser of:

(a) The difference between the employee's average weekly wages before becoming disabled, and the employee's actual wages thereafter; or

(b) The difference between the employee's average weekly wages before becoming disabled, and the employee's wages capable of being earned thereafter.

Bill § 3–106, §§ 9(c)(22) & (23).

Unlike the LHWCA the Bill included a provision, paragraph (23) which, if enacted, would have expressly provided additional compensation to employees whose benefits under the schedule had expired.

Injured employees who had received schedule awards would have been entitled to successive or cumulative benefits.[15] Under the earliest version of the bill, therefore, compensation benefits would have been available to employees whose benefits under the schedule had expired; however, such benefits would have been supplementary to, not alternative to, the benefits under the schedule.

Approximately two months after the Bill's introduction, on April 25, 1979, the sponsor of the Bill,[16] held a hearing called a roundtable discussion. At that hearing, Charles Morgan, Division Staff Manager for Public Affairs of the C & P Telephone Company, made several specific proposals to amend the Bill. Among his suggestions was a proposal to delete § 9(c)(23) of the Bill, the provision which would continue benefits beyond the schedule periods. Mr. Morgan and his assistant, John Catloff, gave essentially two reasons for the proposal to delete that section.[17] First, according to the telephone company representatives, the inclusion of the provision might render the workers' compensation program "very expensive." Second, the inclusion of the provision would render "useless" the scheme of classifying injuries. While neither Mr. Morgan nor Mr.

---

**15.** In *PEPCO* the Supreme Court noted that, in 1972, Congress had considered but had failed to pass an amendment to § 8(c) of the LHWCA which would have provided additional payments subsequent to the expiration of benefits under the schedule. The fact that Congress had failed to pass the amendment did not persuade the Court that Congress intended to say anything regarding alternative benefits or the exclusivity of the schedule. Similarly, the Court did not read the presence of a cumulative benefit provision in the Federal Employees' Compensation Act (FECA), 5 U.S.C. 8101 *et seq.*, as indica-

tive of any congressional views regarding the exclusivity of the schedule in the LHWCA.

**16.** Ms. Hardy also was chairman of the HED Committee.

**17.** Tapes of the roundtable discussion are housed at the District Building, Room 28, with the Legislative Services Unit of the Council of the District of Columbia.

Catloff justified their statements regarding the effects of the inclusion of post-schedule benefits, both gentlemen made clear to the HED Committee members their beliefs that the "employer's obligation has been fulfilled" once the employer finished paying under the schedule and that other benefit payment schemes were for "body-of-the-whole" injuries rather than for injuries to the limbs for which the schedule was designed. From the nature of the testimony of these two witnesses,[18] members of the Council were exposed to arguments which strongly implied that the provisions of § 9(c)(1)–(21) provided the exclusive remedy for injuries to the limbs specified within those provisions and that § 9(c)(22) pertained to body of the whole injuries.

The next recorded activity in connection with the Bill occurred on December 11, 1979, when an amended version of the Bill was presented to the HED Committee for a vote. This amended version of the Bill included several provisions consistent with the specific proposals made by Mr. Morgan. Unlike the original version of the Bill, for example, this amended version did not contain § 9(c)(23). In presenting the Bill to the HED Committee, the committee clerk, Pierre Wessel, did not make reference to the absence of that provision. Instead, he reported that § 9 of the Bill, relating to compensation levels for different classes of disability, was "the same as it is in workmen's compensation."[19] Mr. Wessel described the class of permanent partial dis-

ability as splitting into two categories: awards for the loss of certain parts of the body having a schedule of fixed periods of payments and those of other cases which do not fit into the schedule awards such as lower back pain.

The HED Committee Report[20] issued on January 29, 1980, contained several sentences which indicate that paragraph 9(c)(22) related solely to non-schedule injuries. The first sentence of section (6) on page 11 of the report reads: "The Act [the LHWCA] provides where an employee with a *non-scheduled* partial permanent disability suffers no actual earnings loss, a reasonable wage-earning capacity loss shall establish."[21] The first sentence of section (7) of that page reads: "The Act [the LHWCA] provides that in the event of a *non-schedule* permanent partial disability or temporary partial disability, compensation shall be 66⅔ of the difference between the employee's Average Weekly Wages prior to the injury and his wage-earning capacity after the injury."

In the section-by-section analysis portion of the HED Report, the Committee, in addressing § 9(c) of the Bill, initially outlines the payment schedule for "various types (scheduled) injuries" [sic]. *Id.* at 15. The Report then discusses the compensation payable *in the case of* a hearing loss. Finally, the report notes with respect to permanent partial disability cases that

In *other cases* of disability that are permanent and partial, the compensation is

**18.** The decision by the D.C. Circuit in *PEPCO*, holding that §§ 8(c)(1)–(20) of the LHWCA were not exclusive remedies had been issued on March 22, 1979, a little more than one month prior to the roundtable discussion. Neither of the witnesses, however, referred to the *PEPCO* case.

**19.** Presumably, Mr. Wessel meant that § 9 of the Bill was substantially similar to § 8 of the LHWCA. Since § 9(c)(22) provided for a wage loss rather than a lost earning capacity method of calculating the compensation rate while § 8(c)(22) of the LHWCA used the lost earning capacity method, § 9 of the Bill was not "the same as" § 8 of LHWCA.

**20.** Committee on Housing and Economic Development, Report on Bill 3–106, the District of

Columbia Workers' Compensation Act of 1979, 3rd Council, 2nd Session (1980) (hereinafter referred to as the HED Report).

**21.** The argument that the failure to permit an election of benefits produces incongruous results has considerably less force under the LHWCA. In cases where an employee suffers no actual wage loss, the denial of an ability to elect between scheduled and unscheduled benefits does not place the employee in a worse position. In fact, if for reasons unrelated to the injury, a claimant before the Act could have established a greater wage earning capacity after the injury, then his workers' compensation benefits would have become not income replacement benefits but supplementary wages.

66⅔% of the difference between the lesser of the employee's wages, or his average weekly wages and his former average weekly wages and actual wages, or his average weekly wages and his wages capable of being earned.

HED Report at 16.

From the language of the HED Report, only one conclusion is inferable. Subsection 9(c) of the Bill proposed to provide compensation for two main categories of permanent partial disability: namely, for those specified or scheduled injuries, such as leg or hearing loss and for those disabilities resulting from injuries which did not fall under the schedule, such as chronic back pain.

The PSCA Committee Comment [22] gives further support to that inference. The PSCA Committee wished to amend the Bill to make § 9(c)(22) of the Act identical to § 8(c)(21) of the LHWCA. Under § 8(c)(21) of the LHWCA an employee could recover a permanent partial disability award even though he did not suffer a wage loss. All that was required was proof of an impairment to the employee's wage-earning capacity. The phrase "other cases," therefore, was not meant, under the PSCA version of the Bill, to refer exclusively to wage loss cases. Like the HED Report, the PSCA Comment supports the view that 9(c)(22) of the Act was intended to provide compensation for disabilities arising out of injuries which were not compensable under the schedule provision of §§ 9(c)(1)–(21).

Interpreting the language and intent of the Act in a manner which recognizes the mutually exclusive nature of the schedule provisions and the "other cases" provision of the permanent partial disability section does not do violence to the principle that workers' compensation statutes should be liberally construed so as to avoid harsh or incongruous results. The putative fact that over the long-term the accumulated benefits received by a claimant may be far higher than the total benefits received under the schedule aside, the fact remains that under the schedule employees receive over the short-term higher benefits and receive those benefits more quickly. A quick and certain remedy, although the renumeration is ultimately lower, is a legitimate goal of a workers' compensation statute, and does no harm to the well-established principle that workers' compensation statutes are remedial in nature. *Lee v. District of Columbia Department of Employment Services*, 509 A.2d 100, 104 (D.C. 1986). In enacting § 8(c) of the LHWCA in 1927, Congress sought to provide quick and certain payments for what then were the most common kinds of industrial accidents. 606 F.2d at 1333. To accomplish this end, Congress created a schedule to avoid a case-by-case, time-consuming determination in these types of cases. While applying the schedule to all injuries of a specified type might award benefits to those who do not suffer any wage loss, neither the Courts nor agencies administering the LHWCA may rewrite the statute by ignoring its plain language. 449 U.S. at 283, 101 S.Ct. at 517.

The Council essentially adopted § 8(c) of the LHWCA as written. This department must observe the plain language of the Act which makes the § 9(c)(22) remedy available to non-schedule injuries only.

## IV. *Average Weekly Wages*

The Hearing Examiner rejected Claimant's argument that her promotion to a journeyman was new employment with Employer for the purposes of calculating her average weekly wages. Since Claimant had worked for Employer for the full 13 weeks prior to her injury and since there is no reference in the Act to a claimant's position with his employer during the 13 week period, the Hearing Examiner concluded that Claimant's average weekly wages should be computed on the basis of

**22.** Committee on Public Services and Consumer Affairs, Comment on Bill 3–106, the District of Columbia Workers' Compensation Act of 1979, 3rd Council, 2nd Session (1980) (hereinafter referred to as the PSCA Comment).

her total wages during the 13 week period prior to the injury regardless of the position she held during such period.

I see no reason to disturb the Hearing Examiner's conclusion. The language of the Act is clear. It mandates, in § 12(a)(4) of the Act, that an employee's wages from an employer during the 13 preceding weeks of an injury be the basis of computing the average weekly wage of the employee. Nothing in the statute requires one to consider the full 13 weeks only if the employee has not changed positions with his employer.

In this proceeding, Claimant was employed by Employer for the 13 consecutive week period preceding the injury. Since Claimant earned wages by the hour during that period, calculation of her wages fell within the prescriptions of § 12(a)(4). Accordingly, I adopt the Hearing Examiner's findings and conclusions.

### ORDER

Having reviewed the exceptions, the responses, precedents and secondary sources, it is hereby

ORDERED That Claimant's request for permanent partial disability benefits paid in accordance with § 9(c)(22) of the Act is DENIED. The portion of the Proposed Compensation Order computing Claimant's average weekly wages is hereby adopted as a part of this Order. The issue of the percentage of disability to the leg is REMANDED to the Hearings and Adjudication Section.

/s/ Floyd S. Goff

FLOYD S. GOFF

Acting Director

Department of Employment Services

5/23/86

Date